IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WORLDNET TELECOMMUNICATIONS,
INC.,

Plaintiff

v.

TELECOMMUNICATIONS REGULATORY
BOARD OF PUERTO RICO, and MIGUEL
REYES DÁVILA; VICENTE AGUIRRE
ITURRINO; JORGE L. BAUERMEISTER;
and PUERTO RICO TELEPHONE
COMPANY, INC.,

Defendants

PUERTO RICO TELEPHONE COMPANY,
INC.,

Plaintiff

v.

TELECOMMUNICATIONS REGULATORY
BOARD OF PUERTO RICO; and MIGUEL
REYES DÁVILA; VICENTE AGUIRRE
ITURRINO; and JORGE L.
BAUERMEISTER, in their official
capacities as Members,

Defendants

CONSOLIDATED CASES:

CIVIL 04-2051 (JAF)

CIVIL 04-2073 (JAF)

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs WorldNet Telecommunications, Inc. (hereinafter "WorldNet") and

Puerto Rico Telephone Company, Inc. (hereinafter "PRT") filed two separate actions

CONSOLIDATED CASES:                    2
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

challenging an order of the defendant, the Telecommunications Regulatory Board of Puerto Rico (hereinafter "TRB"). (Docket Nos. 1 & 10.) WorldNet's complaint is against PRT, the TRB and the individual members of the TRB, Miguel Reyes Dávila (the President), Vicente Aguirre Iturrino and Jorge L. Bauermeister. (Docket No. 1.) PRT's complaint is only against the TRB and its members. (Docket No. 10.) These actions, which are brought pursuant to section 252(e)(6) of the Telecommunications Act of 1996, 47 U.S.C. § 252(e)(6) (hereinafter "Telecom Act"), were consolidated on October 21, 2004. (Docket No. 11.) The following is a synopsis of the relevant facts giving rise to the present controversies.

Plaintiff WorldNet, a corporation organized under the laws of the Commonwealth of Puerto Rico, is a telecommunications carrier as that term is defined by the Telecom Act, 47 U.S.C. § 153(44), and Act No. 213 of September 12, 1996, P.R. Laws Ann. tit. 27, § 269d(b) (hereinafter "Law 213"). It has been authorized by the TRB to operate as a reseller and as a "competitive local exchange carrier" (hereinafter "competitive LEC") and to provide telecommunications services. Plaintiff PRT, also a Puerto Rico corporation, is a monopoly provider of local exchange and switched access services within the Commonwealth of Puerto Rico. PRT is an "incumbent local exchange carrier" (hereinafter "incumbent LEC") within the meaning of the Telecom Act and Law 213. The TRB is an agency of the Commonwealth of Puerto Rico in charge of regulating the interstate operations of

CONSOLIDATED CASES:                    3
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

telecommunications carriers in Puerto Rico.  P.R. Laws Ann. tit. 27, §§ 267e and 267f.  The TRB qualifies as a "State Commission" under 47 U.S.C. §§ 153(41), 251 and 252.  Co-defendant Miguel Reyes Dávila is the President of the TRB.  Co-defendants Vicente Aguirre Iturrino and Jorge L. Bauermeister are members of the TRB.  They are all sued in their official capacities for purposes of injunctive and declaratory relief.

The present controversies arose from a dispute between WorldNet and PRT in regards to an interconnection agreement between the parties.  WorldNet, one of the larger competitive carriers in Puerto Rico, had been purchasing, among other things, wholesale services from PRT pursuant to an interconnection agreement entered into in January of 2002.  When WorldNet sought renewal of the agreement with PRT, the former sought to include a large number of changes.  PRT claims to have adopted more than half of the changes proposed by WorldNet.  However, it was PRT's position that some of the terms and conditions insisted upon by WorldNet were outside the requirements of federal law and were impermissibly burdensome on PRT.

On December 2, 2003, WorldNet filed a petition with the TRB pursuant to 47 U.S.C. § 252(b)(1) to arbitrate the unresolved issues in the renewal of the interconnection agreement.  The TRB assigned Docket No. JRT-2003-AR-0001 to the proceedings and appointed Verónica M. Ahern, an attorney with the law firm of

CONSOLIDATED CASES:                    4
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Nixon Peabody LLP, to act as arbitrator.  Over 350 issues were initially presented by the parties to the arbitrator for resolution.[1]  A hearing on those issues which remained unresolved was held during a three day period from February 23-25, 2004.  The arbitrator presided over the hearing and the members of the TRB were also present.  Extensive pre- and post-hearing submissions were made.  The arbitrator issued her order on March 29, 2004 in which she decided some 80 disputed issues.  On April 20, 2004, the parties jointly submitted an executed interconnection agreement for approval by the TRB.  The agreement conformed to the arbitrator's order.  On May 18, 2004, the TRB issued an order approving the interconnection agreement between WorldNet and PRT.  Subsequently, both parties moved for reconsideration of the arbitrator's order.  On September 7, 2004, the TRB ruled on the parties' requests for reconsideration.  Portions of the TRB's order on reconsideration are the subject of the summary judgment motions.

The parties attack the TRB's order on several different fronts.  I will analyze each particular argument in the discussion section of this report and recommendation.  WorldNet filed a motion for summary judgment on January 14,

---

[1]By mutual consent, the parties assigned standard numbers to the different issues.  The parties reference the numbers assigned when arguing the different issues in controversy.  I will use the same issue numbers for the sake of clarity and to avoid confusion.

CONSOLIDATED CASES:                    5
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

2005.  (Docket No. 42.)  PRT and the TRB[2] filed their respective responses in opposition to WorldNet's motion on January 31, 2005. (Docket Nos. 48 & 51.) Also before the court is a motion for summary judgment filed by PRT on January 14, 2005.  (Docket No. 43.)  WorldNet and the TRB opposed PRT's motion on January 31, 2005.  (Docket Nos. 46 & 49.)  The court also has before it a motion for summary judgment filed by the TRB (Docket No. 44, January 14, 2005) and the oppositions of WorldNet and PRT.  (Docket Nos. 47 & 48, January 31, 2005.) Since the parties submitted these three separate motions in a flurry of activity in January of 2005, many of the issues they present are duplicative.

Finally, there are two additional summary judgment motions filed in response to WorldNet's supplemental complaint of February 10, 2005.  The supplemental complaint was filed in response to the TRB's second order on reconsideration, which revisited one particular issue.

The TRB moved for summary judgment as to this supplemental complaint on March 25, 2005.  (Docket No. 59.)  WorldNet subsequently opposed this motion on April 29, 2005, and the TRB responded by filing a reply to WorldNet's opposition on May 20, 2005.  (Docket Nos. 68 & 78.)  PRT also filed its own summary judgment motion which seeks the dismissal of WorldNet's supplemental complaint.  (Docket

---

[2]When I make reference to the TRB, I am also including the individual co-defendants.

CONSOLIDATED CASES:                       6
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

No. 60, March 28, 2005.) WorldNet submitted an opposition to this motion on
April 29, 2005. (Docket No. 67.)

These specific matters were all referred to me for a report and
recommendation on April 12, 2005. (Docket No. 65.) In light of the overlapping
in issues, I will address all five motions for summary judgment in this report and
recommendation. Each motion or issue is discussed separately and each will be
decided according to the following standard.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To succeed on a
motion for summary judgment, the moving party must show that there is an absence
of evidence to support the nonmoving party's position. Celotex Corp. v. Catrett, 477
U.S. 317, 325 (1986). Once the moving party has properly supported its motion,
the burden shifts to the nonmoving party to set forth specific facts showing there is
a genuine issue for trial and that a trier of fact could reasonably find in its favor.
Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).
The party opposing summary judgment must produce "specific facts, in suitable
evidentiary form," to counter the evidence presented by the movant. López-

CONSOLIDATED CASES:                    7
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Carrasquillo v. Rubianes, 230 F.3d 409, 413 (1st Cir. 2000) (quoting Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994)).  A party cannot discharge said burden by relying upon "conclusory allegations, improbable inferences, and unsupportable speculation."  Id.; see also Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002) (quoting J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1251 (1st Cir. 1993)) ("'[N]either conclusory allegations [nor] improbable inferences' are sufficient to defeat summary judgment.").

The court must view the facts in light most hospitable to the nonmoving party, drawing all reasonable inferences in that party's favor.  See Patterson v. Patterson, 306 F.3d 1156, 1157 (1st Cir. 2002).  A fact is considered material if it has the potential to affect the outcome of the case under applicable law.  Nereida-González v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

## III.  APPLICABLE LAW AND ANALYSIS

With the enactment of the Telecom Act of 1996, Congress sought to facilitate competition in a traditionally monopolized local telephone market.  "States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry."  AT & T Corp. v. Iowa Util. Bd., 525 U.S. 366, 371 (1999).  Among other duties, an incumbent LEC has the obligation to interconnect and share its networks with competitors.  See 47 U.S.C.

1   CONSOLIDATED CASES:                8
2   CIVIL 04-2051 (JAF)
    CIVIL 04-2073 (JAF)
3

4   § 251; see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 638

5   (2002).  An incumbent can comply with these duties in one of three ways:  (1) by

6   selling local telephone services to competitors at "wholesale rates" (47 U.S.C. §
7
8   251(c)(4)(A)); (2) by allowing the competitor to interconnect in the incumbent

9   LEC's network (47 U.S.C. § 251(c)(2)); and (3) by leasing elements of its networks

10  to a competitor on an "unbundled basis" (47 U.S.C. § 251(c)(3)).  AT & T Corp. v.

11  Iowa Util. Bd., 525 U.S. at 371; see also Bell Atl.-Pa., Inc. v. Pa. Pub. Util. Comm'n,
12
13  295 F. Supp. 2d 529, 532 n.1 (E.D. Pa. 2003).

14          Under the Telecom Act, an incumbent provider is also required to negotiate

15  in good faith with the competitor.  47 U.S.C. § 251(c)(1).  If the parties cannot

16  resolve their differences in this negotiation process, they can petition the state's

17  regulatory authority (state commission) to arbitrate any disputed issues.  47 U.S.C.
18
19  § 252(b); Global NAPS, Inc. v. Verizon New England, Inc., 396 F.3d 16, 19 (1st Cir.),

20  cert. denied, 125 S. Ct. 2522 (2005); Mich. Bell Tel. Co. v. Climax Tel. Co., 202 F.3d

21  862, 866 (6th Cir. 2002).  In resolving the issues submitted for arbitration, the state

22  commission must make sure that the resolution of said issues and any conditions
23
24  imposed on the parties to the agreement meet the requirements of 47 U.S.C. § 251

25  and any regulations prescribed by the Federal Communications Commission under

26  the Act.  47 U.S.C. § 252(c)(1).  Any agreement reached, be it by negotiation or

27  following arbitration, must be submitted to the state commission for approval.  47

28

CONSOLIDATED CASES:                    9
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

U.S.C. § 252(e)(1); <u>P.R. Tel. Co. v. Telecomms. Regulatory Bd. of P.R.</u>, 189 F.3d 1, 8 (1st Cir. 1999); <u>MCI Telecomm. Corp. v. Bell Atl. Pa. Serv.</u>, 271 F.3d 491, 500 (3rd Cir. 2001). "The commission may reject any negotiated agreement if it discriminates against a third party carrier or if its implementation is 'not consistent with the public interest, convenience, and necessity.'" <u>Global NAPS, Inc. v. Verizon New England, Inc.</u>, 396 F.3d at 19 (quoting 47 U.S.C. § 252(e)(2)(A)). Thereafter, any party aggrieved by any determination of the state commission may bring an action in the appropriate federal court to challenge the state commission's determination as not compliant with the requirements of section 251 and/or 252 of the Act. 47 U.S.C. § 252(e)(6); <u>U.S. W. Commc'ns Inc. v. MFS Intelenet, Inc.</u>, 193 F.3d 1112, 1116 (9th Cir. 1999). Both WorldNet and PRT have sought review of the TRB's determinations.

The First Circuit recently articulated the standard to be applied by a court reviewing a state commission's determinations under 47 U.S.C. § 252(e)(6). Citing a number of cases from other circuits, the First Circuit explained that issues of law, including agency determinations interpreting the Telecom Act, are reviewed de novo. <u>Global NAPS, Inc. v. Verizon New England, Inc.</u>, 396 F.3d at 23 n.8 and cases cited therein.[3] Where no error of law exists, other state agency determinations are

───────────────

   [3]<u>See, e.g.</u>, <u>Ind. Bell Tel. Co. v. McCarty</u>, 362 F.3d 378, 383 (7th Cir. 2004); <u>MCImetro Access Transmission Servs. v. Bellsouth Telecomms., Inc.</u>, 352 F.3d 872, 876 (4th Cir. 2003); <u>Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.</u>, 350 F.3d 482, 486 (5th Cir. 2003); <u>U.S. W. Commc'ns, Inc. v. Sprint Commc'ns Co.</u>, 275 F.3d 1241,

CONSOLIDATED CASES:                          10
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

reviewed under the arbitrary and capricious standard. Id.[4]  In New England Tel. & Tel. Co. v. Conversent Commc'ns of R.I., 178 F. Supp. 2d 81 (D.R.I. 2001), the court explained the arbitrary and capricious standard. It stated:

> This Court must review the [TRB's] action to ensure that [the TRB] considered all the relevant factors, articulated a reasonable connection between the facts and the conclusion drawn, and did not make a clear error in judgement. "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." The focus of the arbitrary and capricious standard is on the rationality of the agency's decision-making process, not the rationality of its decision. Arbitrary and capricious is a deferential standard of review, but it is not a rubber stamp. The reviewing court

_____

1248 (10th Cir. 2002); AT & T Commc'ns of N.J., Inc. v. Verizon N.J., Inc., 270 F.3d 162, 169 (3d Cir. 2001); AT & T Commc'ns of the S. States, Inc. v. Bellsouth Telcomms., Inc., 268 F.3d 1294, 1296 (11th Cir. 2001); U.S. W. Commc'ns, Inc. v. MFS Intelenet, Inc., 193 F.3d at 1117.

[4]See, e.g., MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d 539, 548 (6th Cir. 2004); U.S. W. Commc'ns, Inc. v. Sprint Commc'ns Co., 275 F.3d at 1248; Sw. Bell Tel. Co. v. Waller Creek Commc'ns, Inc., 221 F.3d 812, 816 (5th Cir. 2000); U.S. W. Commc'ns, Inc. v. MFS Intelenet, 193 F.3d at 1117. Some courts have applied a "substantial evidence" standard of review to factual determinations. U.S. W. Commc'ns, Inc. v. Jennings, 304 F.3d 950, 958 (9th Cir. 2002); MCI Telecomms. Corp. v. U.S. W. Commc'ns, Inc., 204 F.3d 1262, 1266 (9th Cir. 2000). It appears that there is no meaningful difference between the substantial evidence standard and the arbitrary and capricious standard with respect to the review of fact findings. See GTE S., Inc. v. Morison, 199 F.3d 733, 745 n.5 (4th Cir. 1999).

CONSOLIDATED CASES:                    11
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

> must conduct a "thorough, probing, in-depth review" and
> a "searching and careful" inquiry into the record.

Id. at 91 (citations omitted).

With these standards in mind, I now consider the arguments of the parties in favor of and against summary judgment.  As each issue is introduced, it will be noted whether the TRB's decision with respect to that particular issue warrants either de novo review or the more deferential arbitrary and capricious standard of review.

## IV.  RECIPROCAL AUDITING RIGHTS

The first issue raised by any of the summary judgment motions is whether or not WorldNet should be permitted a right to reciprocally audit PRT's compliance with its operation support systems[5] (hereinafter "OSS") obligations under the interconnection agreement.  This issue is raised by each party  in its respective summary judgment motion filed on January 14, 2005.  (Docket Nos. 42, 43, & 44.)

To best determine the validity of WorldNet's claim that the TRB arbitrarily denied it the right to reciprocal audits of PRT's OSS, it is necessary to understand the context within which WorldNet sought such a right.  In order for WorldNet to offer services to its customers it requires access to PRT's OSS.  Therefore, an

---

[5]The OSS is a complex network of programs that helps PRT, or any competitors accessing it, monitor, control and manage problems within the telephone network. The OSS is also vital to basic functions such as ordering, billing, tracking usage, and reporting.

CONSOLIDATED CASES:                                    12
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

essential part of the interconnection agreement between PRT and WorldNet was the

granting of a license to WorldNet for use of, and access to, PRT's OSS.  The granting

of this license is found in section 7.5 of the interconnection agreement.  In this same

section, PRT retained the right to audit WorldNet's use of the license to ensure that

such use complied with the conditions of the license.  However, both the arbitrator

and the TRB rejected WorldNet's request to make this right to audit reciprocal.[6]  In

---

[6]The proposed audit provision read as follows:

> Section 7.5.5.1. Each Party shall have the right (but not
> the obligation) to audit the other Party no more than once
> annually to ascertain whether the other Party is complying
> with the requirements of this Agreement with regard to
> access to, and use and disclosure of, PRTC OSS Information
> and/or CPNI Information. Each Party may commence an
> audit only after providing the other Party with at least
> thirty (30) days' advance notice. The auditing Party shall
> be responsible for its own costs in conducting the audit
> and any reasonable costs incurred by the audited Party to
> facilitate the audit. The auditing Party shall be liable to the
> audited Party for any damage caused to the audited Party's
> system or property. The auditing Party shall also provide
> the audited party a detailed report of the findings obtained
> by the audit within thirty (30) days of the conclusion of
> the audit.

> Section 7.5.5.2. Without in any way limiting any other
> rights each Party may have under this Agreement or
> Applicable Law, each Party shall have the right (but not the
> obligation) to monitor access to and use of PRTC OSS
> information which is made available by PRTC to WorldNet
> pursuant to this Agreement to ascertain whether the other
> Party is complying with the requirements of this
> Agreement with regard to access to, and use and disclosure
> of, such PRTC OSS information. The foregoing right shall

1
2
3

CONSOLIDATED CASES:                    13
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

4
5
6
7
8

other words, WorldNet was not permitted the right to audit PRT's compliance with

its duties under the interconnection agreement.  Since the TRB's decision as to this

issue was within its discretion, I recommend that the WorldNet's summary

judgment be DENIED and the PRT and TRB's motion be GRANTED.

9
10
11
12
13
14
15
16
17
18
19
20

　　　　WorldNet's first basis for challenging the TRB's refusal to allow it the right to

a reciprocal audit is that such refusal was primarily rooted in the misplacement of

WorldNet's auditing proposal within the interconnection agreement.  Such a non-

substantive reason for denying the audit suggests that the TRB's decision was

arbitrary and capricious.  However, WorldNet's own summary judgment motion

cites language from the TRB's order on reconsideration that demonstrates that its

decision was reached on other grounds.  WorldNet quotes the TRB's order on

reconsideration as stating that "[s]ince no WorldNet OSS information will be used,

and no license granted to PRTC by WorldNet, there is no reason to make the audit

right reciprocal."  (Docket No. 42, at 15 n.14.)

21
22
23
24

　　　　Although this statement refutes the claim that the TRB based its decision

solely on the placement of the proposed reciprocal audit right, it does form the basis

of WorldNet's more compelling argument.  WorldNet maintains that the arbitrator

25
26
27

　　　　　　　　include, but not be limited to, the right (but not the
　　　　　　　　obligation) for PRTC to electronically monitor WorldNet's
　　　　　　　　access to and use of PRTC OSS Information which is made
　　　　　　　　available by PRTC to WorldNet through PRTC OSS Facilities.

28

(Docket 42, Attach. B, at 14 n.12.)

CONSOLIDATED CASES:                    14
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

and the TRB misinterpreted WorldNet's objective in proposing the audit provision and consequently failed to address the issue on the merits.  The audit right WorldNet claims it sought through the proposed language was the right to audit PRT's compliance with its OSS obligations under the interconnection agreement.  However, WorldNet asserts that the language in the TRB's decision demonstrates that it wrongly understood the proposal as a right to audit PRT's use of WorldNet's OSS – a right that could not exist since PRT had no right to use WorldNet OSS information.

There is merit to a claim that the TRB entirely misunderstood the right that WorldNet was seeking to enforce under the interconnection agreement.  If this were true, WorldNet might be correct in asserting that the TRB acted arbitrarily since it would have failed to address the proper issue before it.  However, the record does not reflect such a total failure on the part of the TRB.  WorldNet adequately explained the type of auditing rights it requested both in testimony at the arbitration hearing and in its post-hearing brief.  Yet for several reasons, the TRB's refusal to grant the reciprocal auditing right should be left untouched.

First, the TRB correctly comprehended WorldNet's argument that the arbitrator had misunderstand the purpose of the reciprocal audit.  Rather than be preoccupied with its placement, the TRB appeared concerned that WorldNet's proposed language could be interpreted to provide it with even greater auditing rights than it purportedly was seeking.  WorldNet's proposal risked this

CONSOLIDATED CASES:                    15
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

interpretation largely because it chose to take the language of PRT's auditing right and replace several words and phrases to make the right reciprocal. (Docket No. 1, Ex. A, at 93.) The alternative would have been to draft a separate clause that would have clarified and narrowed the right it was seeking. Since WorldNet did not do so, the TRB was reasonable in determining that it risked granting too expansive a right had it approved the proposal. Both the TRB and PRT correctly insist that WorldNet is asking this court to substitute its own judgment for that of the TRB, something that may not be done under the arbitrary and capricious standard of review.

Also fatal to WorldNet's motion on this issue, is that it presents no authority, whether in FCC or state regulatory orders or in case law, to support its request for a reciprocal auditing right. Instead, WorldNet unconvincingly notes that reciprocal auditing provisions are common in interconnection agreements with respect to issues such as billing. The existence of reciprocal auditing clauses regarding billing practices has no bearing on the present discussion. The TRB acted correctly in not according this comparison any weight.

Having decided that WorldNet's claims essentially ask this court to insert its own judgment in place of the TRB's, I recommend that its summary judgment motion regarding reciprocal auditing be DENIED. I thus recommend that the PRT and TRB's motion concerning the same issue be GRANTED.

CONSOLIDATED CASES:                    16
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

## V.  ACCESS TO NETWORK AND CUSTOMER INFORMATION

WorldNet next challenges another section of the TRB's order concerning the parties' rights to, and obligations under, PRT's OSS.[7]  In particular, WorldNet argues that the TRB should have permitted it access to PRT's OSS in the same time and manner that any of PRT's personnel typically have access.  Instead the TRB adopted the arbitrator's position allowing WorldNet access only to the extent that PRT's retail employees have such access.

WorldNet argues that the TRB failed to properly apply a prior Federal Communications Commission (hereinafter "FCC") order, In the Matter of Implementation of the Local Competition Provisions of the Telecomms. Act of 1996, 15 F.C.C.R. 3,696 (1999) (UNE Remand Order).  In this order, the FCC extended to competitive LECs access to "loop qualification information"[8] to the same extent as any employee of an incumbent LEC and not just its retail employees.  Id. at 3,886-87, ¶ 430.  WorldNet believes that the TRB should have reasonably concluded that the FCC's finding regarding loop qualification information applies equally to WorldNet's proposed access to all of PRT's OSS.  A review of other FCC decisions

---

[7]As with the reciprocal audit issue, the access issue is also raised in PRT and the TRB's respective summary judgment motions.  (Dockets Nos. 43 & 44.)

[8]Loop qualification information "identifies the physical attributes of the loop plant . . . that enables carriers to determine whether the loop is capable of supporting xDSL and other advanced technologies." In the Matter of Local Competition Provisions of the Telecomms. Act of 1996, 15 F.C.C.R. at 3,884-86, ¶ 426 (footnote omitted).

CONSOLIDATED CASES:                    17
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

reveals that the TRB was not only reasonable in its outcome, but would have directly contradicted FCC precedent had it embraced WorldNet's proposal.  See, e.g., In the Matter of Application by Qwest Comm'ns Int'l, Inc., 17 F.C.C.R. 26,303 (2002).

    In Qwest, the FCC acknowledged the continued validity of its finding in the UNE Remand Order in stating that "Qwest provides competitors with access to all of the same detailed information about the loop that is available to itself and in substantially the same timeframe as any of its own personnel could obtain it."  Id. at 26,340, ¶ 61 (footnote omitted).  However, in an earlier part of the Qwest order, the FCC noted that the relevant standard for access to an incumbent LEC's OSS for pre-order functions is whether the incumbent LEC provides competitors access "in substantially the same time and manner" as it gives its retail operations.  Id. at 26,322-23, ¶ 38 (footnote omitted).

    The reason for the FCC's distinction is straightforward. A competitive LEC's access to loop information allows it to determine whether a particular area is even suitable for certain high-speed services.  Therefore, such a competitor requires the type of access any incumbent LEC employee has in order to know what services it may offer customers in a given area.  However, other functions of an incumbent LEC's OSS, such as pre-ordering and billing, are directly related to customer service.  Accordingly, the FCC allows competitors the same access that an incumbent LEC's retail employees have to the incumbent's OSS for these types of functions.  This type

CONSOLIDATED CASES:                    18
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

of access ensures that competitors can offer equivalent service to their prospective customers at the crucial pre-order stage, but also that competitors are not granted unlimited access to other more sensitive areas of the incumbent LEC's OSS.

     With this understanding in mind, it is clear that the TRB appropriately abided by FCC precedent when it refused to grant WorldNet access to all of PRT's OSS in the time and manner that any of PRT's employees may access it.

     WorldNet also objects on the grounds that the TRB's order allows PRT to limit its access to crucial OSS information simply by re-defining the already blurry line between retail and wholesale employees.  While the arbitrator did recognize such anti-competitive behavior could occur, this potential problem is not a basis for finding the TRB's order arbitrary.  In fact, the arbitrator's order encourages the TRB to be "alert" to such a possibility and to take action if presented with allegations of such behavior.  WorldNet, therefore, retains the right to bring a complaint should such a harm occur.  However, the TRB's decision cannot be viewed as unreasonable because it did not provide WorldNet the broad access it sought to PRT's OSS based on some conceivable future harm.

                    No-Facilities Notification and Electronic Access to the OSS

     WorldNet has put forth two additional reasons why the TRB's decision regarding OSS access was arbitrary.  WorldNet argues that the TRB essentially ignored evidence that anything other than unlimited access to PRT's OSS would

CONSOLIDATED CASES:                    19
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

result in prejudice to the competitive LEC.  This prejudice, according to WorldNet,

stems from the fact that PRT is under no duty to notify WorldNet if facilities are

unavailable to process an order.  Furthermore, WorldNet asserts that the TRB falsely

presumed that any lack of notice would be cured by WorldNet's electronic access to

PRT's OSS to check its orders.  Such electronic access, WorldNet claims, is severely

deficient and therefore currently offers it little aid in tracking orders.

       While such negative impacts may occur in practice, it is difficult to envision

how the TRB's failure to deem them controlling renders its decision arbitrary or

unreasonable.  It is difficult to locate any place in the record where the TRB was

asked to expressly address the "no-facilities" notification in the context of OSS

access.[9]  Moreover, WorldNet fails to cite any case law or FCC orders addressing such

an argument.

       If problems persist with PRT's implementation of an electronic OSS, WorldNet

may seek to address such a problem by bringing it to the TRB's attention.

Nevertheless, the TRB's decision cannot be viewed as arbitrary where it made a

decision to limit WorldNet's OSS access to the time and manner that PRT's retail

employees enjoy such access.  The TRB could have easily concluded that WorldNet's

concerns, while valid, did not warrant the broad access it sought.   This is

_____

       [9]WorldNet was only able to point to the testimony of its witnesses with respect
to "no-facilities" notification and electronic access.  (Docket No. 42, at 13-14.)  It
does not, for example, maintain that it presented this argument in its post-
arbitration hearing brief.

CONSOLIDATED CASES:                    20
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

particularly true where, as detailed above, the TRB complied with relevant FCC precedence. In addition, the TRB could reasonably have determined that WorldNet's concerns did not outweigh the imposition of forcing total access to its OSS on PRT.

And finally, PRT argues with some persuasiveness that WorldNet's "no-notification" and electronic access claims suggest it has no such rights under the contract. To the contrary, PRT points out that it must provide notification in case an order cannot be completed and that WorldNet has the right to nondiscriminatory access to PRT's OSS.[10]   Although WorldNet may believe it is entitled to greater safeguards, these issues were factual determinations by the TRB. As such, they should be accorded deference.

In light of the above, it is clear that the TRB acted within its discretion in permitting WorldNet access to PRT's OSS only to the extent that PRT's retail employees have such access. Therefore, I recommend that WorldNet's motion be DENIED and the PRT and TRB's motion respecting the same issue be GRANTED.

## VI. LIQUIDATED DAMAGES

WorldNet also challenges the TRB's decision to completely exclude liquidated damages from the interconnection agreement. The TRB's decision reversed the findings of the arbitrator, who had adopted WorldNet's liquidated damages proposal.

---

[10]Under the "Additional Services Attachment," section 7.2.3.8, PRT must give such WorldNet notice within three days of the WorldNet order.  Section 7.2.1 provides WorldNet with nondiscriminatory access.

CONSOLIDATED CASES:                    21
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Once again, PRT and the TRB have also moved for summary judgment as to this issue.

WorldNet's objection to the TRB's decision not to include its liquidated damages[11] provision in the interconnection agreement also invokes an arbitrary and capricious standard of review.  The TRB's decision as to this issue did not concern an interpretation of either the Telecom Act or Law 213, but rather rested upon its view of the facts and circumstances relating to the liquidated damages proposal. Since the TRB acted unreasonably in striking liquidated damages from the interconnection agreement in toto, I recommend that WorldNet's motion be GRANTED as to the issue of liquidated damages.  Although I recommend that the TRB's decision as to this issue be set aside, I believe that the record is suitable to justify a substitution of judgment for that of the TRB.  Therefore, I further recommend that the TRB revisit the issue of liquidated damages and fashion an appropriate provision consistent with the suggested findings below.

————————————

[11]There is some disagreement between the parties as to the proper terminology to be used for the proposed damages clause. WorldNet believes the appropriate term to be "self-effectuating enforcement mechanism" or "SEEM."  On the other hand, PRT views the use of SEEM as a euphemistic means of referring to "liquidated damages."  After reviewing FCC orders, it appears that self-effectuating enforcement mechanisms encompass a variety of remedies, of which liquidated damages is one type.  See, e.g., In the Applications of Nynex Corp., 12 F.C.C.R. 19,985, 20,077, ¶ 194 (1997).  Since WorldNet's proposal pertains to set damages upon PRT's breach, the more appropriate term for the purposes of this discussion is "liquidated damages."

CONSOLIDATED CASES:                22
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Liquidated Damages – Generally and in the
Context of Interconnection Agreements

Ordinarily, a liquidated damages clause is included in a contract between two parties.  The clause sets the amount of damages to be paid to the aggrieved party should the other party breach the contract.  In order for a court to uphold a liquidated damages clause it must find that the amount specified is "reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."  Space Master Int'l v. City of Worcester, 940 F.2d 16, 17 (1st Cir. 1991) (citing Restatement (Second) of Contracts § 356(1) (1979)).  An amount that is unreasonably large is unenforceable on public policy grounds.  Space Master Int'l v. City of Worcester, 940 F.2d at 17.  Where the loss is difficult to quantify it will be easier for a party to demonstrate that the fixed amount is reasonable.  Id. at 17-18.

The scenario here defies the normal contractual relationship in which liquidated damages usually arise.  Therefore, to best understand how the TRB's decision was arbitrary, it is first necessary to understand how liquidated damages provisions have typically been treated in the context of interconnection agreements.  WorldNet claims that the FCC, as well as individual states, have expressed a preference for liquidated damages in interconnection agreements in order to facilitate the competition the Telecom Act seeks to foster.  The TRB, in its opposition to WorldNet's motion, contends that the cases and FCC orders cited by WorldNet are not applicable since WorldNet's proposal was punitive in nature.  The TRB, in its

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CONSOLIDATED CASES:                      23
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

own summary judgment motion, also cites cases standing for the general proposition that liquidated damages provisions must only be for compensatory, and not punitive, purposes. See, e.g., Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 238 (1st Cir. 1983).

The most obvious difference between liquidated damages in the usual contract and the present scenario is the relationships between the parties.  Typically, two parties voluntarily form a contract because each side has something to offer the other.  Conversely, negotiations between an incumbent LEC and a competitor are forced upon the incumbent by law, and involve just one party that has something of significant value to offer the other.  Therefore, the use of state agency review of disputed issues in an agreement and other interconnection rules has been viewed as a means of equalizing bargaining power.  See In the Matter of Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 11 F.C.C.R. 15,499, 15,520, ¶ 41 and 15,528, ¶ 55 (1996) (Local Competition Order).  The FCC also views the Telecom Act as granting broad authority to state utilities agencies to adopt "specific rules . . . and any other specific conditions [the state agencies] deem necessary to provide new entrants . . . with a meaningful opportunity to compete in local exchange markets." Id. at 15,657, ¶ 310.

CONSOLIDATED CASES:                    24
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

<u>FCC and District Court Decisions Regarding</u>
<u>Liquidated Damages in Interconnection Agreements</u>

FCC orders bear out WorldNet's point that liquidated damages clauses are common in interconnection agreements.  In reviewing various applications of large telecommunications carriers to enter new markets, the FCC regularly makes reference to liquidated damages agreements that these carriers are subject to in the markets they had already operated in.  <u>In the Matter of Joint Application by BellSouth Corp.</u>, 17 F.C.C.R. 17,595, ¶ 294 (2002) (BellSouth faces other consequences for providing poor service to competitors including "liquidated damages agreements under dozens of interconnection agreements"); <u>In the Matter of Application by Verizon New England Inc.</u>, 17 F.C.C.R. 7,625, ¶ 78 n.270 (2002); <u>In the Matter of Application by SBC Commc'ns, Inc.</u>, 15 F.C.C.R. 18,354, 18,561-62, ¶ 424 (2000).  In another sign that the FCC favors the use of liquidated damages provisions to promote competition, former FCC Chairman Michael Powell urged Congress to require that liquidated damages be included in interconnection agreements by law.  <u>FCC Chairman Powell Recommends Increased FCC Enforcement Powers for Local Tel. Competition</u>, 2001 WL 473851, at *2 (May 7, 2001).

Few federal court decisions have touched upon liquidated damages clauses in interconnection agreements.  However, the few that have support the position that such provisions are integral in meeting the underlying goal of the Telecom Act to stimulate competition in local markets.  See, e.g., <u>MCI Telecomms. Corp. v. BellSouth</u>

CONSOLIDATED CASES:                25
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Telecomms. Inc., 298 F.3d 1269, 1273-74 (11th Cir. 2002); U.S. W. Commc'ns, Inc.
v. Hix, 57 F. Supp. 2d 1112, 1121-22 (D. Colo. 1999); U.S. W. Commc'ns, Inc. v. TCG
Or., 31 F. Supp. 2d 828, 837-38 (D. Or. 1998).  In MCI, the Eleventh Circuit upheld
the district court's reversal of the Florida Public Service Commission's (hereinafter
"FPSC") decision regarding liquidated damages.  MCI Telecomms. Corp. v. BellSouth
Telecomms. Inc., 298 F.3d at 1274.  The FPSC had initially ruled that it did not have
the authority under 47 U.S.C. § 252 to include a liquidated damages clause in an
interconnection agreement.  MCI Telecomms. Corp. v. BellSouth Telecomms. Inc.,
298 F.3d at 1273.  Citing 47 U.S.C. § 252(b)(4)(C), the Eleventh Circuit held that
"enforcement and compensation provisions . . . fall within the realm of 'conditions
. . . required to implement' the [interconnection] agreement."  MCI Telecomms.
Corp. v. BellSouth Telecomms. Inc., 298 F.3d at 1274.

In TCG Oregon, the federal district court acknowledged that the Telecom Act
did not expressly provide for liquidated damages provisions, but noted that such
clauses were permissible so long as they "are reasonable and justified under the
circumstances."  U.S. W. Commc'ns, Inc. v. TCG Or., 31 F. Supp. 2d at 837.  The
court then discussed some of the reasons that liquidated damages clauses could be
useful in the context of interconnection agreements.  Id. at 837-38.  These reasons
included the severe threat posed by an incumbent LEC's deficient service, the
difficulty in quantifying and proving damages in cases of failure to provide adequate

CONSOLIDATED CASES:                    26
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

service, and the need for liquidated damages to avoid costly and time consuming

litigation. Id. The court also observed that in rendering a decision as to a liquidated

damages provision, a state commission may take into account its past experiences

in dealing with the particular incumbent LEC. Id. at 837. In light of these factors,

as well as the amount of the liquidated damages, the district court upheld the state

commission's inclusion of the damages provision in the interconnection agreement.

Id. at 838.

     The TRB properly understood that it was within its discretion to include

WorldNet's liquidated damages proposal. The above discussion provides an overview

of the issue and of what factors the TRB might have used in reaching a decision.

These cases and orders  reveal that liquidated damages clauses in interconnection

agreements are common and serve to further the goals of the Telecom Act.  In this

light, these enforcement provisions are typically viewed with a presumption of

favorability unless they are shown to be punitive in nature.  The TRB's decision

evidences a misunderstanding of the use of liquidated damages, as well as of

WorldNet's specific purpose for requesting their inclusion in the agreement.

<u>The Purpose of WorldNet's Liquidated Damages Proposal</u>

     The TRB claims that its decision to strike WorldNet's liquidated damages

proposal was due to its being punitive in nature. If a reading of the TRB's order on

reconsideration, as well as its summary judgment opposition and motion, showed

CONSOLIDATED CASES:                    27
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

this to be the case, the inquiry would be complete and the TRB's decision upheld. However, TRB may have a confusion between the use of liquidated damages to punish and their use to provide an incentive to perform.  Furthermore, the TRB insists that WorldNet has argued that it is permissible for liquidated damages clauses to be punitive in nature.  WorldNet makes no such self-defeating argument here or in the record before the Board.

Again, the traditional rules governing liquidated damages apply here.  A liquidated damages provision is enforceable only if it "is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience of or non-feasability of otherwise obtaining an adequate remedy.'" Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d at 238 (quoting. U.C.C. § 2-718(1)).

Although the TRB insists that its decision rested primarily on a finding that WorldNet's proposal was punitive in nature, a close reading of its order on reconsideration does not bear this out.  In setting aside the arbitrator's order, the TRB focused on the testimony of David Bogaty (hereinafter "Bogaty"), a witness for WorldNet at the arbitration.  In the order on reconsideration, the TRB noted that Bogaty denied that the damages proposal was intended to be punitive. (Docket No. 1, Ex. E, at 45, ¶ 2.)  It nevertheless inferred such an intent since Bogaty acknowledged that WorldNet viewed the damages proposal as a means of ensuring

CONSOLIDATED CASES:                28
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

PRT's compliance with the interconnection agreement.  Yet the very essence of liquidated damages is that of creating an efficient way to ensure a party's performance under an agreement.  FCC orders and district court opinions have recognized this basic fact regarding liquidated damages, particularly those relating to interconnection agreements.  U.S. W. Commc'ns, Inc. v. Hix, 57 F. Supp. 2d at 1121-22 (damages provisions are designed to encourage compliance with the agreement by setting forth clear remedies where a party fails to comply); In the Applications of Nynex Corp., 12 F.C.C.R. at 20,077, ¶ 194 (threat of liquidated damages provides an incumbent LEC with incentive to meet performance standards independent of complaints to an agency or the courts).

Rather than acknowledge that such a purpose is acceptable with respect to liquidated damages, the TRB seized on WorldNet's desire to give PRT an incentive to perform as if it were an "admission." The TRB repeatedly muddled the considerable distinction between incentivizing performance and unreasonably punishing breaches.  Without question, a damages clause that is punitive will also have the effect of encouraging performance.   However, here the TRB's order on reconsideration reveals that it believed the reverse to be true as well –that a damages clause designed to encourage performance is automatically punitive.  By casting WorldNet's desire to incentivize performance in such an unfavorable light, the TRB acted unreasonably and misconceived the relevant inquiry.

1
2
3

CONSOLIDATED CASES:                    29
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

4
5
6
7
8
9
10
11
12
13
14
15

      A further problem with the TRB's decision pertaining to liquidated damages, is that it fails to explain precisely how WorldNet's proposal was punitive or failed to be reasonable.  Instead, the TRB's decision implies that any estimation of damages would have been unreasonable.  For example, the TRB stated that not only did it find no support for WorldNet's proposal in the record, but that it could find no support for "any estimate of actual damages WorldNet might incur as a result of a PRTC breach."  (Docket No. 1, Ex. E, at 46, ¶ 1) (emphasis added).  Although the TRB failed to explain how  the record was so deficient as to offer no evidence of any actual damages, the Board has also confused difficulty in estimating actual damages with their non-existence.

16
17
18
19
20

      Even for those unfamiliar with the complexities of telecommunications' systems, it is not difficult to envision how an incumbent LEC's failure to provide adequate service to a competitive LEC will cause significant economic harm.  The words of the court in TCG Or. express how such harm occurs:

21
22
23
24
25
26
27

> If prospective customers try [a competitor's] service only to discover that they cannot reliably obtain a dial tone, that calls are disconnected in the middle of a conversation, or that service orders are not timely filed, then those customers will probably switch back to [the incumbent LEC]. . . .  Adverse publicity will also deter other prospective customers from considering [the competitive LEC].  Even assuming the problems are eventually resolved, that may not be soon enough to save [the competitor].

28

U.S. W. Commc'ns, Inc. v. TCG Or., 31 F. Supp. 2d at 837.

CONSOLIDATED CASES:                    30
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

        These service failures, along with a multitude of other issues found in the 85 performance standards in the interconnection agreement, offer examples of where breaches will harm WorldNet.   Therefore the existence of actual harm was adequately presented before the TRB.  Whether the liquidated damages submitted by WorldNet were reasonable in light of the anticipated harm is a more difficult question.   However, the deposition testimony of Bogaty, as well as other evidence before the TRB, makes clear that WorldNet went to great lengths to calculate damages that are inherently difficult to quantify.[12] (Docket No. 1, Ex. H.) WorldNet utilized a comprehensive approach in order to best estimate the anticipated harm for the breach of each performance standard.  For each standard, WorldNet assigned values to several categories such as "Credibility," "Planning," "Employee Money," and "Quality of Service," to arrive at an estimate of actual loss.  (Id. at 54-58.) WorldNet also took into account whether certain types of breaches were "Time Sensitive" or not.  (Id. at 59.)

        In WorldNet's post-arbitration hearing brief, it expressed the factors weighed in arriving at the figures used in its liquidated damages proposal. (Docket No. 1, Ex.

_____

        [12]The arbitrator agreed that WorldNet's liquidated damages proposal was the product of careful deliberation.  She agreed with WorldNet that liquidated damages should apply to breaches of both "service affecting" and "reporting" performance standards.   (Docket No. 1, Ex. B, at 24.)    Furthermore, in discussing the performance standards themselves, she found them to be the "product of careful consideration, involving WorldNet personnel prioritizing the 'real world' problems that it has encountered with PRTC, and their effect on WorldNet's business."  (Id. at 18.)

CONSOLIDATED CASES:                    31
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

A, at 132-33.)  Such factors included (1) actual damage to WorldNet in the form of personnel costs, credibility, and OSS modification costs; (2) incentive for PRT to perform; (3) the relative importance and severity of a breach of each performance standard; and (4) the need for simplicity in implementation.  (Id. at 132, ¶ 2.) Related to the factors WorldNet considered is an FCC finding in its Nynex order.  In the Applications of Nynex Corp., 12 F.C.C.R. at 20,077, ¶ 194.  Specifically, the FCC has made clear that enforcement mechanisms may go beyond "tangible economic harm" in order to ensure compliance with performance standards.  Id.  Although the FCC did not elaborate on what these intangible harms might include, a proposal for liquidated damages may permissibly take into account harm that cannot be directly linked to a specific breach.  From this perspective, direct harm would include such things as personnel costs, lost accounts, and OSS modification costs. Harm beyond such direct costs would include injury to reputation and other harder to quantify issues.

        In addition, the factors discussed in TCG Oregon and mentioned above, such as the incumbent LEC's past performance and the seriousness of the threat posed by deficient service, are relevant to any determination regarding liquidated damages in an interconnection agreement.  U.S. W. Commc'ns, Inc. v. TCG Or., 31 F. Supp. 2d at 837-38.

CONSOLIDATED CASES:                    32
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

On reconsideration, the TRB would be free to weigh these various factors as it sees fit. It may find that WorldNet's calculation relied too heavily on some of the less tangible harms. However, the TRB's liquidated damages decision in its original order on reconsideration is rendered unreasonable since the TRB did not consider such factors at all. Instead, it incorrectly assumed that to do so would violate established contract law.

<u>Alternatives Available to WorldNet Without Liquidated Damages</u>

_____Finally, there is the issue of whether the avenues of redress, available to WorldNet and identified by the TRB, offered a feasible alternative to a liquidated damages provision. See <u>Barry Wright Corp. v. ITT Grinnell Corp.</u>, 724 F.2d at 238. The TRB justified its setting aside of the arbitrator's inclusion of WorldNet's liquidated damages proposal by finding that WorldNet had other means of enforcing the performance standards. According to the TRB, these avenues of enforcement included further negotiation with PRT and seeking damages or injunctive relief in an appropriate court. (Docket No. 1, Ex. E, at 46-47.)

The first possibility, as WorldNet points out, is unreasonable on its face. The TRB's decision to completely remove liquidated damages from the agreement obviated any need on PRT's behalf to continue negotiating as to that issue. As highlighted above, the nature of interconnection agreement negotiations is an arrangement forced upon incumbent LECs by law. Once the TRB, whose job it is to

CONSOLIDATED CASES:                    33
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

apply and enforce the Telecom Act and Law 213, decides an issue entirely in favor

of an incumbent LEC, it is inconceivable that this incumbent will return to the

bargaining table.

       The second possibility, that of seeking redress in court, is vastly inferior to the

efficiency and directness of liquidated damages.  Forcing WorldNet to engage in

costly litigation every time PRT breaches a performance standard could cause

irreparable harm to its attempts to compete.  However, my recommendation does not

depend on this alternative being wholly unreasonable.  If WorldNet's proposal were

clearly punitive, or had the TRB considered the issues before them correctly, the

TRB's decision that this alternative was feasible would have been within its

discretion.  Nevertheless, the TRB appeared to contradict it own findings with

respect to WorldNet's alternatives in its order on reconsideration.  In rejecting

WorldNet's liquidated damages submission, the TRB "recognize[d] that by doing so

[it] risk[ed] robbing" the performance standards of much of their "intended

efficacy." (Docket No. 1, Ex. E, at 46.)  It also understood that without the threat

of liquidated damages, "there is little reason for PRTC to make any effort to improve

its systems and provide better service to WorldNet." (Id.)

       These statements reinforce the notion that the TRB has abdicated its duties

under the Telecom Act and Law 213 to facilitate competition among

telecommunications companies.  Moreover, these statements indicate that the TRB

CONSOLIDATED CASES:                    34
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

based its decision on a fundamental misunderstanding of its role.  Therefore, I recommend that WorldNet's motion for summary judgment as to this issue be GRANTED and those of the TRB and PRT be DENIED.

## VII.  SUPERIOR SERVICE[13]

PRT's motion for summary judgment is chiefly focused on overturning the TRB's order on reconsideration with respect to one broad issue. (Docket No. 43.) Specifically, PRT claims that many of the performance standards under the interconnection agreement require it to provide service to WorldNet that is superior to that which it provides its own customers.  The PRT argues that the TRB lacks such authority under the Telecom Act and Law 213.  WorldNet opposes the motion on two grounds.  First, it believes that PRT is incorrect in even asserting that the standards at issue require superior service.  Secondly, WorldNet asserts that, even if the standards required superior service, the TRB enjoys this authority under the federal and state acts.

<u>Standard of Review</u>

The arguments put forth by WorldNet in opposition are weighty as they reflect on the standard used in reviewing the TRB's decision.  If the performance standards do not require superior service then the arbitrary and capricious standard will apply

---

[13]The issue raised by PRT's motion is also addressed in the TRB's summary judgment motion.  (Docket No. 44.)  Therefore, my recommendation as to PRT's motion will apply to the corresponding issue in the TRB's motion.

CONSOLIDATED CASES:                    35
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

since there will be no concern as to whether the TRB acted pursuant to its lawful authority. Global NAPS, Inc. v. Verizon New England, Inc., 396 F.3d at 23 n.8 (citing MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 376 F.3d at 548). However, if the standards do call for superior service then the issue becomes whether the Telecom Act or Law 213 grants the TRB the authority to require this level of service. As such, it would be a matter of law to be reviewed de novo. Id.

Although it is unclear that the performance standards require PRT to provide superior service to the extent that PRT claims, they do require superior service in some areas. For example, one standard at 7.2.3.13 of the Additional Services portion of the agreement, reveals that the TRB understood that PRT would have to provide WorldNet with superior service for special service repair requests. (Docket No. 1, Ex. E, app. D, at 178. In light of this acknowledgment, I review PRT's claim de novo to determine if the TRB possessed the authority to require superior service at all.

Discussion

_____Federal Law (Telecommunications Act)

There is no provision in either the Telecom Act or Law 213 that directly addresses the issue of whether an incumbent LEC can be required to supply a competitor with superior service. The Telecom Act explicitly requires that an incumbent provide interconnection service "that is at least equal in quality to that

CONSOLIDATED CASES:                    36
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

provided by the local exchange carrier to itself. . . ." 47 U.S.C. § 251(c)(2)(C). The

Telecom Act also preserves certain authority to the states. The Act specifically states

that "nothing in this section shall prohibit a State commission from establishing or

enforcing other requirements of State law in its review of an agreement, including

requiring compliance with intrastate telecommunications service quality standards

or requirements." 47 U.S.C. § 252(e)(3). In a different section, the Telecom Act

similarly reads:

> Nothing in this part precludes a State from imposing
> requirements on a telecommunications carrier for
> intrastate services that are necessary to further
> competition in the provision of telephone exchange service
> or exchange access, as long as the State's requirements are
> not inconsistent with this part or the [FCC's] regulations
> to implement this part.

47 U.S.C. § 261(c).

PRT believes that this court should follow an Eighth Circuit opinion that,

according to PRT, decisively holds that the Telecom Act forbids requiring an

incumbent LEC from providing superior service to a competitive LEC. Iowa Util. Bd.

v. F.C.C., 120 F.3d 753, 812-13 (8th Cir. 1997).

In Iowa Util., the Eighth Circuit reviewed, at the request of both state utility

commissions and incumbent LECs, many regulations promulgated by the FCC after

the passage of the 1996 Act. Id. at 792. One of the challenged rules[14] would have

---

[14]The regulation is 47 C.F.R. § 51.305(a)(4). It still can be found in the Code
of Federal Regulations, but as a result of the Iowa Util. decision it only requires
equal service.

*1*
*2*
*3*

CONSOLIDATED CASES:                    37
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

*4*   required incumbent LECs to "provide interconnection, unbundled network elements,

*5*   and access to such elements at levels of quality that are superior to those levels at

*6*
*7*   which the incumbent LECs provide these services to themselves, if requested to do

*8*   so by competing carriers." Id. at 812. The Eighth Circuit struck down this rule

*9*   finding no support for the superior service requirement in the language of 47 U.S.C.

*10*  § 251(c)(2)(C). Id. In particular, the court held that the "at least equal in quality"

*11*
*12*  language did not prohibit an incumbent LEC from voluntarily providing superior

*13*  service, but clearly did not grant the FCC the authority to require this level of

*14*  service. Id. at 812-13.

*15*          PRT insists that this holding applies equally in the present case. Yet, the Iowa

*16*  Util. holding is distinguishable from the case scenario. In Iowa Util., the Eighth

*17*
*18*  Circuit vacated the FCC's superior service rule because the rule gave any competitive

*19*  LEC the right to superior service at its request in every interconnection negotiation.

*20*  Id. Such a rule clearly went above and beyond the equal service required by 47

*21*  U.S.C. § 251(c)(2)(C). However, there is nothing in the Eighth Circuit's opinion

*22*  that suggests that a state commission is forbidden from requiring superior service

*23*
*24*  in particular cases where that commission determines such service is necessary to

*25*  further the intentions of the Telecom Act. The Eighth Circuit acknowledged that an

*26*  incumbent LEC could provide superior service "when . . . negotiating agreements

*27*  under the Act." Iowa Util. Bd. v. F.C.C., 120 F.3d at 812. Since all interconnection

*28*

CONSOLIDATED CASES:                    38
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

agreements must be reviewed by a state commission, one may infer that the Eighth Circuit's opinion also leaves room for such a commission to require superior service in individual interconnection agreements.

While PRT would undoubtedly object to such a broad reading of Iowa Util., the court need not rely on this interpretation.  The Seventh Circuit, in an opinion originally cited in the TRB's order on reconsideration, distinguished Iowa Util. in essentially the same manner.  Ind. Bell Tel. Co. v. McCarty, 362 F.3d 378, 391-93 (7th Cir. 2004).  The issue before the Seventh Circuit was whether the Indiana Utility Regulatory Commission (hereinafter "IURC") could require the incumbent LEC to perform "acceptance testing"[15] at the competitive LEC's request even though it would result in the competitor receiving a network of superior quality.[16]  Id. at 391.

The incumbent LEC relied heavily on the Iowa Util. decision, but the Seventh Circuit vigorously disagreed that the Eighth Circuit's reasoning in that case applied to the issue before it.  Specifically, the Seventh Circuit stated that,

_____

[15]The Seventh Circuit explained that "[a]cceptance testing involves [the incumbent's] field technician conducting a noise and frequency response test prior to opening a loop circuit requested by [the competitive LEC]." Ind. Bell Tel. Co. v. McCarty, 362 F.3d at 391.  The test helps ensure that the line is error free so as to provide more reliable and higher quality service. Id.

[16]Procedurally, the issue arrived before the appellate court after the district court overturned the IURC's order requiring superior service of the incumbent carrier via acceptance testing. Id. at 391-92.  Relying on Iowa Util., the district court had ruled that requiring superior quality service violated the plain language of the Telecom Act. Id. at 392.

CONSOLIDATED CASES:                    39
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

> [B]ecause the FCC may not implement a blanket regulation requiring superior quality, [does not mean] that the IURC may not require acceptance testing when, after individualized review, it finds it to be in the public interest and a means of promoting competition in Indiana.

Ind. Bell Tel. Co. v. McCarty, 362 F.3d at 393.

Understanding the Iowa Utilities decision as only reflecting on the FCC's ability to implement such a broad regulation, the Seventh Circuit found nothing in the Telecom Act precluding a state commission from requiring more than equal service on a case-by-case basis. Id. The FCC's regulation requiring superior service, in any and all circumstances, established a new and different standard than the "at least equal" language of 47 U.S.C. § 251(c)(2)(C). Therefore it violated the clear language of the Telecom Act. To the contrary, a state commission order that requires superior service in a particular agreement does not so violate the Act since it meets the "at least equal" standard.

PRT urges this court not to follow Ind. Bell on two other, equally unavailing, grounds. First, it notes that the Seventh Circuit's opinion only addressed superior service with respect to acceptance testing that the incumbent LEC was able to perform. Conversely, the TRB has purportedly required PRT to provide superior service for dozens of performance standards some of which PRT allegedly cannot meet. Therefore, argues PRT, the Seventh Circuit's opinion should be limited to the issue of acceptance testing and/or performance areas that an incumbent can

CONSOLIDATED CASES:                    40
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

demonstrably meet.  However, nothing in <u>Ind. Bell</u> suggests that its holding was to

be limited to acceptance testing.  The Seventh Circuit was addressing the general

issue of whether a state commission could require superior service in a particular

interconnection agreement.  It looked to the same sections of the Telecom Act as are

applicable here for guidance.  That the specific performance standard at issue was

acceptance testing had no bearing on the Seventh Circuit's decision.

    Furthermore, there is no suggestion in <u>Ind. Bell</u> that the required acceptance

testing was any less burdensome on the incumbent LEC as the superior standards

required of PRT.  The opinion merely states that the incumbent would have to

provide testing it did not provide its own customers.  The Seventh Circuit does not

discuss whether the required testing was attainable or not.  In the current case,

PRT's only claim that any of the performance standards are unattainable concerns

the three day notification requirement in case a WorldNet order cannot be

completed.  PRT fails to show how such a three day notification window is

impossible to meet.  Moreover, PRT has failed to list the supposed "dozens" of

superior service standards it is required to provide.  If the level of superior service

is so pervasive and burdensome then PRT should have brought these issues to the

attention of the court.  Moreover, even if the superior service requirements

numbered in the dozens this would be more probative of whether the TRB's decision

was arbitrary and capricious.  However, if the TRB has the authority under the

CONSOLIDATED CASES:                    41
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Telecom Act to require superior service then there is no reason to believe it is limited

to only requiring such service as to one area of the agreement.

     Finally, PRT points out that this court is not bound to follow a decision from

another circuit. See, e.g., United States v. Marder, 48 F.3d 564, 575 (1st Cir. 1995).

However, since the Seventh Circuit's rationale in Ind. Bell is well grounded, a valid

reason to ignore it does not exist.

     In light of the foregoing, nothing precluded the TRB from requiring the PRT

to provide WorldNet with superior service in certain portions of the interconnection

agreement.  The inquiry next turns to whether Law 213 permitted the TRB's action

in requiring PRT to provide superior service.

     Puerto Rico Law - Law 213[17]

_____

[17]Though none of the parties raised the issue of whether this court has jurisdiction to consider the TRB's actions where they pertained to state law, it is an issue that should be addressed.  The First Circuit has made clear that a federal court may not review a state commission's decision regarding an aspect of an interconnection agreement where such a decision is based on state law and is not inconsistent with the federal Telecom Act. P. R. Tel. Co. v. Telecomm. Regulatory Bd., 189 F.3d 1, 13-15 (1st Cir. 1999).  However, the First Circuit explicitly noted that its decision applied to state commission rulings in contexts other than the acceptance or rejections of interconnection agreements.  Id. at 15.  It instead declined to answer the jurisdictional question in the context of an acceptance or rejection of an interconnection agreement.  Id.  Given the language in 47 U.S.C. § 252(e)(4), which precludes state courts from reviewing state commission decisions regarding the acceptance or rejection of an interconnection agreement, it is necessary for this court to review any state law issues in order to ensure they are subject to review at all.

     For the practical purposes of this case, the determination that subject matter jurisdiction exists to review issues decided based on state law does not change the

CONSOLIDATED CASES:                    42
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)


As mentioned, Law 213 also contains no provision directly applying to the ability of the TRB to require superior service.  Therefore, the TRB determined it had this authority based on language in two separate provisions of Law 213.  First, the TRB cited language found in P.R. Laws Ann. tit. 27, § 267f(f).  This section mandates that the TRB's actions "be governed[18] by the Federal Communications Act, the public interest, and especially by the protections of the consumers' rights."  P.R. Laws Ann. tit. 27, § 267f(f).  The TRB found further support in P.R. Laws Ann. tit. 27, § 267i, which reads in relevant part:

> The provisions of this chapter shall be liberally construed in order to achieve its purposes. . . .  The [TRB] created herein shall have, in addition to the powers specified in this chapter, all those additional, implicit or incidental powers that are pertinent and necessary to put into effect and carry out, perform and exercise all the abovementioned powers and to attain the purposes of this chapter, subject to the superseding of said powers by federal legislation or rules of the [FCC].

P.R. Laws Ann. tit. 27, § 267i.

PRT  believes that these two provisions are too vague to confer the type of authority the TRB maintains it possesses with respect to requiring superior service.

_____

outcome of the recommendation.  Were jurisdiction not to exist with respect to the state law issue, the TRB's decision regarding superior service would still be upheld.

[18]The TRB noted in its order on reconsideration that the word "governed" in the English translation of Law 213 found on Lexis or Westlaw should probably be "guided."  The Spanish word used in the original language is "guiar."  Nevertheless, this distinction, does not affect the outcome of a decision as to this issue.

CONSOLIDATED CASES:                    43
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

PRT also cites several decisions that, although not directly relating to the superior service issue, supposedly demonstrate support for a narrow reading of the TRB's authority under Law 213.

The main thrust of PRT's argument is that the TRB used the "vague" language of P.R. Laws Ann. tit. 27, § 267f(f) and P.R. Laws Ann. tit. 27, § 267i to grant itself authority not intended by the legislature.[19]  It asserts the Supreme Court of Puerto Rico has forbidden the TRB from liberally construing the statutory language of Law 213 as providing greater authority than that actually delegated.  Caribe Commc'ns, Inc. v. P.R. Tel. Co., 2002 JTS 91, 1301 (P.R. Jun. 18, 2002).  Moreover, PRT insists that legislative silence is the equivalent of an affirmative denial of authority.  See Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd., 29 F.3d 655, 681 (D.C. Cir. 1994).

In spite of the authority PRT relies upon, none is applicable to the present issue.  With Caribe Commc'ns, PRT takes a relatively narrow holding and applies it to the entirety of Law 213.  The issue in Caribe Commc'ns was whether the TRB could assess damages against PRT and force it to pay such damages to another telecommunications provider.  Caribe Commc'ns, Inc. v. P.R. Tel. Co., 2002 JTS 91, 1304.  The Court held that the TRB could not assess damages since Law 213 did not authorize it to do so.  Id. at 1315.  The Court was persuaded by the fact that the

_____

[19]I also note the PRT's argument that the TRB must not act in a way so as not to conflict with federal statutes and regulations.  However, since nothing in the Telecom Act precludes the TRB from requiring superior service, this argument carries no weight in the discussion of Law 213.

CONSOLIDATED CASES:                    44
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

Telecom Act allowed the FCC to assess damages whereas such express authority was

absent from Law 213.  Id. at 1315-16.  From this difference, the Court reasonably

inferred that the Puerto Rico Legislature intended to deny this authority to the TRB.

Id. at 1316.

In Caribe Commc'ns, the Court was unwilling to allow the TRB the ability to

assess damages against PRT for two reasons.  First, the Court believed that it was

unfair to subject an incumbent LEC to damage awards where some of the safeguards

of a civil court case, such as discovery and rules of evidence, are lacking.  Id.

Secondly, the Court was concerned that holding damages hearings would detract

from the TRB's ability to focus on issues more suited to its specialized knowledge.

Id.  Essentially, what the Court believed was that damage assessments are peripheral

to the TRB's state mission of promoting competition in the telecommunication

industry of Puerto Rico.  Therefore, the language of P.R. Laws Ann. tit. 27, § 267i

allowing the TRB to use non-specified powers to carry out the purposes of Law 213

was not so broad as to allow it to assess damages.  To the contrary, the ability to

require an incumbent LEC to provide a certain level of service is centrally related to

the stated goals of Law 213.

In a previous decision involving the PRT as a party, the Court signaled that

Law 213 was to be liberally construed so as to facilitate competitive behavior in the

telecommunications industry and therefore benefit consumers.  P.R. Tel. Co. v.

Telecomms. Regulatory Bd. of P.R., 151 D.P.R. 269, 278-79 (2000).  In relevant part

CONSOLIDATED CASES:                    45
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

the Court noted that nothing in our legal system requires that the power to issue an order be expressly delegated to an agency.  To the contrary, our system grants delegation of the power to adjudicate, in liberal and general terms, and it would be absurd to require the Legislature to include in an agency's enabling act every possible order it may issue for its orders to be seen as properly delegated.  Id. at 290.

Thus, the holding in Caribe Commc'ns was meant to apply only to the TRB's ability to assess damages.  Furthermore, the present issue is one that falls under the liberal and broad delegation powers as it directly pertains to the purposes of Law 213.

Not to be lost in the discussion of P.R. Laws Ann. tit. 27, § 267i, is the other section cited by the TRB to validate its claims of authority as to the superior service issue. Section 267f(f) of P.R. Laws Ann. tit. 27, directs the TRB to consider both the public interest and especially the rights of consumers. (Emphasis added.) While the Telecom Act mentions the rights of consumers, 47 U.S.C. § 253(b), as something a state commission should seek to safeguard in imposing requirements,  the Puerto Rico Legislature included the word "especially" in Law 213's parallel provision.

The Puerto Rico Legislature emphasized the rights of consumers due to the comparatively poor service the citizens of Puerto Rico receive in the area of telephone service.  The TRB highlighted some of these deficiencies to support its decision to require PRT to provide superior service where it concluded it was necessary.  For example, in its opposition to PRT's summary judgment motion, the

CONSOLIDATED CASES:                    46
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

TRB observed that as of July 2004 the telephone subscribership penetration rate was 93.8% in the United States versus 81.4% in Puerto Rico. The TRB also cited the arbitrator's order which in part stated that the even after two to four years of experience and opportunity, PRT had failed to devote the resources or attention necessary to provide even the most basic services and facilities without substantial operational problems. When the Legislature instructed the TRB to place particular emphasis on the rights of consumers, it was these types of problems it likely had in mind. The broad power that P.R. Laws Ann. tit. 27, § 267i bestows upon the TRB could only have been intended to allow the TRB to require the level of service it deemed necessary to protect the rights of consumers and provide for the public interest.

        The TRB acted in a reasonable fashion in concluding that superior service was imperative as to certain issues. Concerned that some of the performance standards would be too difficult for PRT to meet in the time period established by the arbitrator, the TRB altered these time periods for the benefit of PRT. The TRB added a "six-month hiatus" period to give PRT the opportunity to make the necessary changes to its operational and billing systems. It also modified the arbitrator's finding that PRT could comply with the performance standards 100% of the time. Instead, the TRB elected to impose a compliance level at less than 100% with the ability to monitor and scrutinize PRT's compliance. These adjustments, as well as other factors considered by the TRB, demonstrate that it was not simply wielding its

CONSOLIDATED CASES:                    47
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

authority to punish PRT.  Rather it sought to craft standards that were attainable for PRT, as well as vital to foster competition and improve service for the citizens of Puerto Rico.

         Unlawful Discrimination

_____PRT has put forward one final argument in support of its contention that the TRB unlawfully required it to provide superior service to WorldNet.  The incumbent LEC claims that this level of service forces PRT to discriminate against its own customers since it will be providing them an inferior quality of service in violation of the Telecom's non-discrimination provisions.  47 U.S.C. §§ 202(a) & 251(c).  PRT's argument as to this point inverts the clear meaning and intent of these two provisions. Title 47 U.S.C. § 251(c) plainly states that its subsections are obligations that must be met by incumbent LECs.  The provision in no way applies to state commissions or competitive LECs.  Furthermore, once PRT provides the required level of service to WorldNet, there is no reason PRT cannot provide this same service to its own customers.

       Title 47 U.S.C. § 202(a) forbids "common carriers" from unreasonably discriminating against any "person, class of persons, or locality."  The TRB, the party requiring the disputed level of service from PRT, is not a common carrier.  As a result this provision is inapplicable.

        Having determined that federal law does not preclude the TRB from requiring superior service, and that Law 213 permits the TRB to require PRT to provide

CONSOLIDATED CASES:                    48
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

superior service where it is necessary to further the Law's goals, I believe that the TRB possessed the authority PRT challenges. Thus, I recommend that PRT's motion with respect to superior service be DENIED and that WorldNet and TRB's corresponding motion be GRANTED.

## VIII.  BUNDLED SERVICES PACKAGES

### Hybrid Bundled Services Packages

The final two issues presented concern the obligation of PRT to provide non-telecommunication services either to WorldNet or to WorldNet's customers.  The first of these two issues poses the question of whether the TRB should have required PRT to make all services included in any of its bundled service packages, including non-telecommunications ones, available for resale to WorldNet.  The TRB initially agreed with the arbitrator's adoption of WorldNet's proposal.[20]  PRT then appealed the TRB's ruling to this court.  Subsequently, at the request of the parties, this court, remanded the issue of bundled service packages to the TRB for further consideration.  The TRB, evaluating only the parties' original evidence and arguments, reversed itself in its second order on reconsideration issued on January 11, 2005.  WorldNet, believing that the TRB decided the issue improperly, filed a supplemental complaint in this case on February 10, 2005.  (Docket No. 52.)  Both

---

[20]WorldNet's proposal would have required PRT to resell to WorldNet, its bundled service packages in their entirety, meaning both the telecommunication and non-telecommunication services within them.

CONSOLIDATED CASES:                    49
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

the TRB and PRT have moved for summary judgment with respect to this issue.

(Docket Nos. 59 & 60.)

As with the issue of superior performance, the decision of the TRB will be

reviewed de novo.  The decision as to this issue, as the TRB itself acknowledges, was

based on its understanding that the Telecom Act does not permit it to require PRT

to resell any non-telecommunications services offered in any of PRT's bundled

services packages.

Before delving into the arguments presented by the parties, a description of

what bundled services packages actually are is appropriate to give context to the

issue.  Essentially, a bundled service package is a collection of several different

services made available to customers by a single telecommunications provider.[21]  For

instance, such a provider may "bundle" local phone service with internet and/or

long distance service.  The ability to offer these types of bundled packages has

become increasingly important as consumers have grown to expect the convenience

such packages offer.

The Telecom Act imposes an affirmative duty on incumbent LECs "to offer for

resale at wholesale rates any telecommunications service that the carrier provides

at retail to subscribers who are not telecommunications carriers."  47 U.S.C. §

---

[21]For purposes of clarity, I will at times use the term "hybrid bundled services
package" to identify such packages that include both telecommunications and non-
telecommunications services.

CONSOLIDATED CASES:                            50
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

251(c)(4)(A).  Of significance here is that the parties are not in disagreement as to what services are considered telecommunications services under the Telecom Act.[22] Instead, the relevant inquiry is whether a bundled services package should be classified as a "telecommunications service" so long as the package contains at least some telecommunications services.  WorldNet's position is that such a hybrid bundled services package should be considered as one single "telecommunications service" under 47 U.S.C. § 251(c)(4)(A).  From this perspective, a bundled package should be treated as a single "telecommunications service" because multiple services are bundled together and offered as one package to the customer at a cheaper rate than the services would cost if purchased individually.

     The TRB and PRT, on the other hand, believe there is nothing in the language of 47 U.S.C. § 251(c)(4)(A) which remotely suggests that non-telecommunications services, if included in a bundled package, must be made available for resale to a competitive LEC.  The case law regarding this issue is virtually non-existent.  In fact, the parties have located only two FCC orders that address the specific issue, and these orders briefly visit the subject.  Although I will subsequently address other arguments presented by WorldNet, the basic question whether the TRB had the

_____

[22]The Telecom Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. 153(46).

CONSOLIDATED CASES:                    51
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

authority to require the resale of all services in a bundled package turns on the

language of the Telecom Act and the orders interpreting it.

   The first order discussed by the parties is the <u>Local Competition Order</u>, supra,

at 23, that the FCC issued shortly after the passage of the 1996 Act.  In it, the FCC

sought to explain and offer guidance as to how the Telecom Act's new provisions are

to be implemented in practice.  With respect to 47 U.S.C. § 251(c)(4)(A) and the

issue of bundled service packages, the FCC concluded that the "plain language of the

1996 Act requires that the incumbent LEC make available at wholesale rates retail

services that are actually composed of other retail services, i.e., bundled service

offerings."  <u>In the Matter of Implementation of the Local Competition Provisions of</u>

<u>the Telecomms. Act of 1996</u>, 11 F.C.C.R. at 15,936, ¶ 877.

   This language does make clear that the FCC intended that bundled service

packages be offered for resale at wholesale rates.  However, nothing in either the

background, comments, or discussion of the issue suggests that the FCC was

contemplating non-telecommunications services included in a bundled package. <u>See</u>

<u>id.</u> ¶¶ 869-877.  Therefore, as the TRB and PRT insist, the <u>Local Competition Order</u>

can only be read as holding that bundled service packages comprised of several

telecommunications services must be available at wholesale rates.  To permit the

interpretation of the FCC's language that WorldNet now urges essentially amounts

to guessing at what the FCC would have determined had it been presented with the

precise issue in dispute now.  Such speculation cannot form the basis of finding that

CONSOLIDATED CASES:                    52
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

47 U.S.C. § 251(c)(4)(A) requires PRT to make available, at wholesale rates, non-telecommunications services when they are  included in hybrid bundled packages.

Further bolstering the TRB and PRT's position, is another FCC order which briefly touched upon the bundled packages issue.  In addressing a resale of services issue, the FCC remarked in a footnote that it was not persuaded by the competitive LEC's argument that the incumbent should make its bundled offerings that include deregulated CPE and internet access available for resale.  In the Matter of Application of Verizon N.Y., Inc., 16 F.C.C.R. 14,147, 14,166, ¶ 42 n.93 (2001) (Verizon Connecticut Order).  The FCC then summarily concluded its assessment by stating that the "resale obligation clearly extends only to telecommunications services offered at retail." Id. While the FCC is less than clear as to how the resale of the telecommunications services in a bundled package should be carried out, it is clear that non-telecommunications services should not have been part of any resale.

WorldNet insists that the conclusion the FCC reached in this footnote was limited to the facts at issue in the Verizon Connecticut Order.[23]  However, when the

---

[23]WorldNet also argues that the Verizon Connecticut Order is inapplicable here since it involved a 47 U.S.C. § 271 application, which involves a carrier requesting permission from the FCC to provide interLATA long distance service in a particular area.  However, WorldNet's assertion evidences a misunderstanding of what 271 applications encompass.  As part of any 271 application, the applicant carrier must adequately demonstrate for the FCC that it has met certain requirements with respect to any interconnection agreements it has entered into with competitive LECs pursuant to 47 U.S.C. § 252.  47 U.S.C. § 271(c)(2)(B).  One of these "checklist"

CONSOLIDATED CASES:                    53
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

FCC emphatically stated that an incumbent's resale obligation "clearly extend[ed] only to telecommunications services offered at retail," it decided the issue as a matter of law and not based on the specific facts of that situation.

Accordingly, the TRB was correct in concluding that it lacked the authority to force PRT to resell any non-telecommunications services found in any of its bundled offerings at wholesale rates to WorldNet.

Law 213 and Procedural Default

WorldNet also attempts to have me consider its claim that Law 213 requires the TRB to adopt its position with respect to non-telecommunications services in bundled packages. However, such an argument was never formally raised before the TRB in any of WorldNet's numerous submissions throughout both the arbitration and the TRB's subsequent review.

It is settled that a party typically may not raise a claim or argument on appeal that it failed to raise at trial. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995) (quoting United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992)). In certain extraordinary circumstances, a reviewing court may entertain a claim or argument not presented at proceedings occurring at a previous trial or hearing. Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.2d at 627-29 (failure to address the

requirements is that the incumbent carrier have made telecommunications services available for resale in accordance with 47 U.S.C. § 251(c)(4). Id. at (c)(2)(B)(xiv). Therefore, the FCC was addressing the same bundled package issue before this Court now.

CONSOLIDATED CASES:                    54
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

newly raised issue could result in unwarranted federal court intrusion into the operations of a state legislature); United States v. La Guardia, 902 F.2d 1010, 1012-13 (1st Cir. 1990) (court should address new challenge since it raised issued of constitutional magnitude that could affect rights of future defendants).  Some of the factors the First Circuit has used in determining whether to make an exception and hear a new challenge include whether (1) the issue is purely a legal one requiring no further factual development, (2) the new claim involves an issue of constitutional importance, (3) the moving party's argument is highly persuasive, (4) the opposing party will suffer prejudice or inequity, (5) the omission seems inadvertent rather than deliberate, and (6) "the omitted issue implicates matters of great public moment, and touches upon policies as basic as federalism, comity, and respect for the independence of democratic institutions."   Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d at 627-28.  Upon weighing such factors, a reviewing court must only exercise its discretion to hear the new claim or challenge if the equities heavily preponderate in favor of such a step.  Id. at 627.

The First Circuit applies the doctrine of procedural default similarly in the administrative context.  Adams v. U.S. Envtl. Prot. Agency, 38 F.3d 43, 50 (1st Cir. 1994).  Although the extraordinary circumstances exception to the doctrine of procedural default also exists in appeals of administrative rulings, the First Circuit has suggested that the exercise of discretion to hear a new claim or argument is even more limited.  See Massachusetts v. Sec'y of Agric., 984 F.2d 514, 523-24 (1st Cir.

CONSOLIDATED CASES:                    55
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

1993).  When an administrative body is able to address all of the parties' claims and

objections, it "can apply its expertise, exercise its informed discretion, and create a

more finely tuned record for judicial review."  Id. at 523.  Enforcing procedural

default also discourages parties from "simply turning to the courts as a tribunal of

first resort."  Id.  Finally, the First Circuit stated that the "courts [generally] will

not entertain an issue that the parties failed to raise in the proper administrative

venue unless the issue is jurisdictional in nature or some other compelling reason

exists."  Id. at 524 (citing United States v. L. A. Tucker Truck Lines, Inc., 344 U.S.

33, 38 (1952); Rana v. United States, 812 F.2d 887, 889-90 & n.2 (4th Cir. 1987)).

        The extraordinary circumstances justifying the review of a new issue on

appeal are not present in this case.  For one, the new argument does not pertain to

the TRB's jurisdiction.  Furthermore, while the issue may be a legal one, it does not

invoke critical issues of constitutional importance as were found to be prevailing in

other contexts such as criminal cases.  And finally, there is no other compelling

reason advanced by WorldNet for why this court should address its argument with

respect to Law 213.

        The outcome might be different if WorldNet was correct in stating that it had

no incentive to raise the state law argument before the TRB.  However, WorldNet is

mistaken when it claims that raising its state law argument prior to appealing to

this court was unnecessary given that the arbitrator, and initially the TRB, adopted

its proposal based on their interpretation of federal law.  The appropriate time to

CONSOLIDATED CASES:                56
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

raise the state law argument was prior to the respective decisions of the arbitrator

and the TRB.  WorldNet had every incentive before these orders were issued to raise

all grounds supporting its position with respect to the bundled services package

issue, as well as every other issue before the Board.  To entertain WorldNet's state

law challenge for the first time on review would be to permit it to seek first resort

in this court.  As such, the exception to the doctrine of procedural default does not

apply and WorldNet's state law argument is waived.[24]

        Shielding Telecommunications Services

        WorldNet also presents an array of alternative theories for reversing the TRB's

decision regarding the PRT's obligations to resell the services in hybrid bundled

offerings.  It first argues that the TRB ignored compelling evidence that its decision

would permit PRT to shield its telecommunications services by bundling them in

hybrid packages.

        This conclusion is odd given that the issue being decided was whether a hybrid

bundled services package must be considered a single telecommunications service

under the Telecom Act.  If it was so considered, PRT would have to provide the entire

bundle, including any non-telecommunications components, at wholesale to

_____

[24]Without delving fully into WorldNet's state law challenge since it is waived, I also note that my findings regarding federal law would likely preclude any decision that Law 213 calls for the TRB to require for resale all services in hybrid bundled packages.  Given that federal law forbids requiring the resale of non-telecommunications services at wholesale rates, such a conclusion would be inconsistent with the Telecom Act.  47 U.S.C. § 261(c).

CONSOLIDATED CASES:                    57
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

WorldNet.  Contrarywise, if PRT was not so required, such a finding would not relieve PRT of its duties under the Telecom Act to resell the telecommunications services in any bundle to WorldNet at wholesale rates.  Therefore, this argument forms no basis for reversing the TRB's decision as to the primary issue.

Nevertheless, the TRB's decision does exhibit a level of confusion regarding the import of its ruling.  Specifically, the TRB's statement that it was "comforted by [PRT'] assertions that its telecommunications services will be made available for resale" is disconcerting.  The statement reveals that the TRB believes that, if PRT so chose, it could shield its telecommunications services from resale by including them in a hybrid bundle.  The TRB's assumption here is not in keeping with its decision and is in violation of the clear mandate of 47 U.S.C. § 251(c)(4)(A).  The general issue the TRB correctly decided was that PRT need not provide any non-telecommunications services included in a hybrid bundled package.  However, 47 U.S.C. § 251(c)(4)(A) still clearly applies to the telecommunications services in such bundled packages.  Therefore, the interconnection agreement must reflect that PRT is required by law to resell to WorldNet all telecommunications services, whether included in hybrid bundles or not, at wholesale rates.

When the TRB revisits the liquidated damages issue, it will also make any necessary changes to the interconnection agreement to reflect the fact that PRT must comply with 47 U.S.C. § 251(c)(4)(A), meaning that in the context of bundled packages PRT must resell those elements to WorldNet that constitute

CONSOLIDATED CASES:                    58
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

telecommunications services.   WorldNet's arguments are otherwise unavailing

insomuch as it claims that the TRB should have required hybrid bundles to be resold

in their entirety due to PRT's anti-competitive behavior.   While WorldNet may be

correct that public policy and consumer rights should guide the TRB in many

respects, taking into account such factors clearly does not permit the TRB to require

action that is directly inconsistent with the Telecom Act.

            Pricing of Telecommunications Services in Hybrid Bundles

_____A second peripheral issue that WorldNet raises concerns the appropriate price

PRT   must   charge   for   the   telecommunications   services   provided   to   WorldNet.

WorldNet's   concern   is   over   the   lack   of   certainty   in   the   second   order   on

consideration as to what rate would apply to the resale of telecommunications

services found in hybrid bundled services packages.   More specifically, WorldNet

believes the second order allows for two very different methods of pricing the

telecommunications services included in hybrid bundles and made available for

resale to WorldNet.

        One possibility is that PRT must make such services available to WorldNet

based on the discounted prices those services are offered at when provided to

customers as part of a bundle.   The other possibility is that PRT may meet its

obligations to provide these telecommunications services by making them available

CONSOLIDATED CASES:                    59
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

at a price based on what PRT charges for these services when provided in a non-discounted, non-bundled manner.[25]

The TRB, on the other hand, believes that its second order on reconsideration adequately addresses WorldNet's concerns over pricing.  However, rather than state how or where the second order answers the pricing question, the TRB claims WorldNet has contrived hypotheticals in order to undermine its decision.  Although WorldNet does use hypotheticals to clarify its argument, this does not eliminate the underlying problem.  The essential point as to the pricing issue is that the second order fails to consider it.

The TRB's reassurance that it will "respond accordingly" should the PRT engage in inappropriate conduct in relation to the pricing of telecommunications services included in hybrid bundles also fails to address the underlying issue.  The purpose of the interconnection agreement is to provide clear guidelines for PRT and WorldNet.  If either party violates a part of the agreement, then the TRB's role is to enforce the agreement.  Given the TRB's failure to address the pricing issue in the second order on reconsideration, the interconnection agreement cannot provide the necessary guidance with respect to this issue.  Once the TRB establishes the

_____

[25]WorldNet refers to these telecommunications services when provided apart from a bundled offering as "standalone services."  Given its simplicity, this term will be used for the remainder of the report and recommendation where applicable.

CONSOLIDATED CASES:                    60
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

appropriate basis for determining the prices PRT must resell telecommunication

services to WorldNet, then any future enforcement issues can be expedited.

Therefore, just as the TRB must ensure that the interconnection agreement

reflects that PRT is legally obligated to provide telecommunications services, even

if included in a hybrid bundle, it must also revisit the pricing issue. The relevant

inquiry is whether the wholesale rate at which WorldNet may purchase

telecommunications services included in a hybrid bundle must be based on the

standalone rates or the discounted, bundled rates.

Telecommunications Services PRT Receives Through Affiliates

The final issue WorldNet raises that the TRB failed to make clear in its second

order on reconsideration is whether PRT is obligated to make available for resale to

WorldNet those telecommunications services it receives from affiliated entities. This

particular issue is entirely absent from the TRB's second order.  However, both

WorldNet and PRT interpret PRT's obligations with respect to telecommunications

services it gets from affiliates in diametrically opposed manners.

WorldNet believes that the Telecom Act requires PRT to make available for

resale those telecommunications services provided to PRT by affiliated entities.  It

also argues that, even if the Telecom Act does not require this, PRT effectively

operates the long distance and wireless services at issue and does not simply serve

as the "marketing and billing agent" for these other companies as it claims.  PRT,

though not devoting extensive space to the issue, believes the second order on

CONSOLIDATED CASES:                    61
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

reconsideration does not require it to make available for resale those telecommunications services it receives through affiliated entities.

The TRB's position as to this issue is that WorldNet is again attempting to create a problem where none exists. It believes there is no evidence that PRT has attempted to avoid its 47 U.S.C. § 251(c)(4) resale obligations by outsourcing telecommunications services to affiliates. The TRB's claim is undermined by the PRT itself given PRT's vigorous claim that any telecommunications services from affiliates need not be made available for resale.

Since WorldNet and PRT appear headed towards an inevitable confrontation as to this issue, I recommend that the TRB also revisit whether PRT must make telecommunications services available for resale when it receives such services through an affiliated entity.

To conclude, I recommend that the summary judgment motions of the TRB and PRT be GRANTED insofar as they request that the TRB's decision finding that PRT is not required to make available for resale any non-telecommunications services included in any hybrid bundled services packages be affirmed. However, I also recommend that the TRB revisit the pricing and affiliated entities issues, as well as ensure that the interconnection agreement clarify that PRT is obliged to make available any telecommunications services found in bundled services packages.

CONSOLIDATED CASES:                    62
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

<u>PRT's Duty to Provide Non-Telecommunications
Services to WorldNet Customers</u>

The final issue to be addressed is related to, though separate from, the hybrid bundles issue just discussed.  The specific issue is whether the TRB should have required PRT to continue providing non-telecommunications services to consumers once they have turned to WorldNet for telecommunications services.  Each party moved for summary judgment as to this issue in its respective January 14, 2005 motion.  (Docket Nos. 42, 43, & 44.)  In its order on reconsideration, the TRB concluded that PRT was under no duty to continue providing "non-regulated services to a consumer who purchases regulated services from a [competitive LEC]." (Docket No. 1, Ex. E, App. A 105.)

WorldNet's arguments for reversing the TRB's decision as to this issue largely rely upon its belief that it is directly linked with the hybrid bundled services issue. WorldNet claims that the same reasons that justify requiring PRT to make all services in a hybrid bundle available for resale apply equally to this issue.  Its primary basis for claiming the two issues are inextricably linked is that requiring PRT to provide all services in a hybrid bundle would be meaningless if PRT could then proceed to disconnect the non-telecommunications services from the bundled package.

WorldNet's position fails in two ways.  First, is the obvious problem that the Telecom Act does not require an incumbent LEC to make available for resale non-

CONSOLIDATED CASES:                    63
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

telecommunications services that are included in a hybrid bundled services package.
If the two issues are as closely connected as WorldNet asserts, then the TRB's decision regarding the disconnection of non-regulated services must be upheld given that it correctly decided the hybrid bundled services issue.

Secondly, the scenario WorldNet depicts is wrong. If PRT was required by law to provide all services found in a hybrid services package, it would not be permitted to turn around and disconnect the non-telecommunications services included therein. The situation presented by the disconnection issue, is one in which a customer elected to purchase telecommunications services from WorldNet while retaining other, non-telecommunications services from PRT. In such a scenario, no hybrid bundled services packages are involved. In this separate and distinct situation, the TRB ruled that PRT could discontinue the customer's non-telecommunications services since nothing in the Telecom Act precluded such action.

Working under the presumption that these two issues are distinct, there is still no basis for concluding that PRT must be forbidden from discontinuing non-telecommunications services to consumers who switch to WorldNet for telecommunications services. The only authority pertaining to the disconnection issue put forth by any of the parties favors the view taken by the TRB and PRT. In one of its orders, the FCC rejected the request of two competitive LECs that the incumbent LEC be prohibited from refusing to provide DSL service to the

CONSOLIDATED CASES:                    64
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

competitors' customers over the competitors' leased facilities. <u>In the Matter of Joint Application by BellSouth Corp.</u>, 17 F.C.C.R. at 17,683, ¶ 164. Although not the precise issue being considered now, the FCC's language can be applied in this context. If an incumbent LEC cannot be required to provide a non-telecommunications service to a competitor's customers, it similarly should not be required to continue providing such services to such customers. Furthermore, since WorldNet's argument rested almost exclusively on the belief that the disconnection issue was to be treated the same as the hybrid bundles issue, it has cited no authority addressing the disconnection issue on its own. Given this failure to present additional arguments for why the TRB's decision must be undone, I recommend that WorldNet's summary judgment as to this issue be DENIED and the motions of the TRB and PRT GRANTED.

## IX. RECOMMENDATIONS

After considering all of the issues in the five motions for summary judgment before this court, I make the following recommendations. Regarding WorldNet's requested right to reciprocal auditing of PRT's compliance with its OSS obligations, I recommend that WorldNet's motion be DENIED (Docket No. 42) and those of the TRB and PRT GRANTED. (Docket Nos. 43 & 44.) As to the issue of the type of access to OSS information WorldNet should be entitled to, I also recommend that WorldNet's motion for summary judgment be DENIED (Docket No. 42) and those of the TRB and PRT GRANTED. (Docket Nos. 43 & 44.) With respect to the

1
2
3

CONSOLIDATED CASES:                    65
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

4    liquidated damages issue, I recommend that WorldNet's motion be GRANTED

5    (Docket No. 42) and the motions of the TRB and PRT DENIED.  (Docket Nos. 43 &

6    44.)   The TRB is to revisit WorldNet's liquidated damages consistent with the

7    findings stated in that portion of this report and recommendation.   I further

8    recommend that PRT's summary judgment motion regarding the issue of compelled

9    superior service be DENIED (Docket No. 43) and the corresponding motions of the

10   TRB and WorldNet GRANTED. (Docket Nos. 42 & 44.)  As to the issue pertaining to

11   what services from a hybrid bundled services package PRT must make available for

12   resale to WorldNet, I recommend that the TRB and PRT's motion be GRANTED

13   (Docket Nos. 59 & 60) and that the motion of WorldNet be DENIED.  (Docket No.

14   42.)  However, the TRB is to revisit certain peripheral issues that need clarification

15   in the interconnection agreement concerning the broader hybrid bundles issue.

16   Finally, I recommend that WorldNet's motion with respect to whether PRT must be

17   required to continue providing non-telecommunications services to WorldNet's

18   telecommunications customers be DENIED (Docket No. 42), and the motions of the

19   TRB and PRT be GRANTED.  (Docket Nos. 43, 59 & 60.)

20          Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any

21   party who objects to this report and recommendation must file a written objection

22   thereto with the Clerk of this Court within ten (10) days of the party's receipt of this

23   report and recommendation.  The written objections must specifically identify the

24   portion of the recommendation, or report to which objection is made and the basis

CONSOLIDATED CASES:                     66
CIVIL 04-2051 (JAF)
CIVIL 04-2073 (JAF)

for such objections.  Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 5th day of October, 2005.

S/ JUSTO ARENAS
Chief United States Magistrate Judge